American Telephone and Telegraph Co. *vs.* Pearce, *et al.*

THE AMERICAN TELEPHONE AND TELEGRAPH COMPANY OF BALTIMORE CITY *vs.* SARAH A. PEARCE, by her next friend, JOHN C. PEARCE. SAME *vs.* D. STERRETT GITTINGS, Trustee. SAME *vs.* THOMAS J. WILSON and HENRY R. WILSON. SAME *vs.* JACOB WISNER. SAME *vs.* OWEN MONAGHAN. SAME *vs.* MARY E. EWING. SAME *vs.* MALVINA R. EWING. SAME *vs.* GURDON K. TYLER. SAME *vs.* GEORGE A. SMITH. SAME *vs.* DAVID G. McINTOSH.

*Appeal—Practice in Court of Appeals—Eminent domain—Injunction—Erection of Telegraph poles over Right of Way of Railroad Company—New easement—United States Revised Statutes, sections 3964, 5263—Secs. 222–226, of Art. 23 of the Code—Constitutional law—New servitude—Compensation to Owners of Land.*

In deciding an appeal from an order granting a preliminary injunction, the Court can look only to the case made by the bill, though the defendant is required to file an answer before he can appeal, and the answer must appear in the record.

American Telephone and Telegraph Co. *vs.* Pearce, *et al.*

A telegraph or telephone company is, with respect to its right to construct its lines over private property, just as much subject to the provision of section 40 of Article 3 of the Constitution, that forbids the taking of private property for public use without just compensation, as is a railroad or any corporation clothed with the power of taking private property for public use; and the averment that such company is proceeding, or threatens to proceed, to construct its line of poles and wires on and over the complainant's land, without his leave or license, and without paying or tendering him compensation for the use of his lands, for this purpose, is sufficient to entitle him to an injunction.

Where a telephone or telegraph line is constructed by some one over the right of way of a railroad company, or by the railroad company itself, in good faith, for its use and benefit in the operation of its road, and to facilitate its business, or it is reasonably necessary for that purpose, the land-owners have no ground of complaint, such use of their land being within the scope of the original easement for which they have received compensation; but if the line be not constructed for such purpose, it will be a new easement, and put a new and additional burden upon the land, for which the owners will be entitled to compensation.

The Act of Congress, approved 24th July, 1866, (U. S. Rev. Stat., sec. 5263,) providing that telegraph companies shall have the right to construct, maintain, and operate lines of telegraph over any of the military or post-roads of the United States, and the Act of Congress approved 8th June, 1872, (U. S. Rev. Stat., sec. 3964,) declaring all the railroads in the country to be post-roads, do not give telegraph companies the right to construct their lines over the right of way of railroad companies without previously obtaining the consent of the owners of the right of way, or condemning the same for telegraph purposes, and making compensation therefor.

If sections 222–226 of Article 23 of the Code, contain any provision authorizing the construction of telegraph lines on and over private property in the first instance, and then requiring the property owners to seek compensation therefor afterwards by an action at law for damages. it is in conflict with sec. 40 of Art. 3 of the Constitution, which requires just compensation to be "first paid or tendered," before private property can be taken for public use.

Casting an additional burden by erecting a telegraph or telephone line over the right of way of a railroad company, is just as

much taking the land for public use as was the taking of it for the original easement, and Courts of equity have in this State jurisdiction to prevent it by injunction, until compensation is paid or tendered.

At the time a railroad was completed between Baltimore, and Delta in Pennsylvania, it had a line of telegraph poles, with one wire thereon, constructed by D. under a contract with the company, to construct and maintain, at his own cost, a first class telegraph line along the company's right of way, for the purposes of the railroad. This line existed, and was in operation, performing all the necessary work of the company when it was transferred to the company by a contract made with the defendant, a telephone and telegraph company, organized for the purpose of establishing lines of communication, at long distances, by telegraph and telephone, and to do business between the city of New York and cities south of it. By the contract the railway company granted to the defendant the right, at its own cost, to erect, maintain, and operate a telegraph and telephone line over the right of way of the railway company, the railway company not receiving a single substantial privilege which it did not have under the contract with D. Shortly after the execution of this contract the defendant commenced erecting large and tall poles, with arms ten feet in length for the support of the wires, all which were of a character not required to promote the business purposes of the railroad company. HELD:

That the construction of the new and additional line of telegraph by the defendant, imposed a new servitude on the land through which the right of way passed, and the owners of the land were entitled to compensation.

APPEALS from the Circuit Court for Baltimore County, in Equity.

The cases are stated in the opinion of the Court.

The causes were argued before ALVEY, C. J., STONE, MILLER, ROBINSON, BRYAN, and McSHERRY, J.

*S. A. Williams,* and *Robert R. Boarman,* for the appellant.

American Telephone and Telegraph Co. *vs.* Pearce, *et al.*

*David G. McIntosh*, for the appellees.

MILLER, J., delivered the opinion of the Court.

These ten cases were argued together, and, as they present substantially the same questions, they will be disposed of in one opinion.   They are all bills filed by separate land-owners in Baltimore County, seeking to enjoin the "American Telephone and Telegraph Company of Baltimore City," a corporation incorporated under the general corporation law of this State, from erecting telegraph poles, and constructing a telegraph or telephone line of wires on and over the lands of the several complainants.   Eight of the appeals are from orders granting preliminary injunctions upon the several bills.   It is well settled that in deciding an appeal from such an order this Court can look only to the case made by the bill, though the defendant is required to file an answer before he can appeal, and the answer must appear in the record.   *Blackburn, et al. vs. Craufurd, et al.*, 22 *Md.* 447.   The question then is, does each of these eight several bills make out a case for the granting of such an injunction?

The bills all aver and charge in substance that the defendant company has recently deposited large and heavy poles upon the lands of the complainants along the line of the Maryland Central Railroad, and is engaged in setting up said poles, or is about to do so, without their permission or consent; that the erection of these poles and the stringing of wires thereon is injurious to their property, and is an appropriation of private property for public use without compensation or tender thereof to the complainants, and that they are entitled to have 'the defendants restrained and enjoined from erecting said poles and stringing wires thereon on and over their lands until it has acquired the right to do so by condemnation of the lands for such use, or otherwise.

American Telephone and Telegraph Co. *vs.* Pearce, *et al.*

We have no doubt as to the sufficiency of these averments, or of the jurisdiction of a Court of equity to grant an injunction in such cases. A corporation created for the purpose of transmitting messages by telegraph or telephone, is, with respect to its right to construct its lines over private property, just as much subject to the provisions of Art. 3, sec. 40, of the Constitution, as is a railroad or any corporation clothed with the power of taking private property for public use. *Lewis on Eminent Domain, sec.* 172; *Mills on Eminent Domain, sec.* 21. This clause of the Constitution is too plain to admit of any doubt, and the averment that the defendant is proceeding, or threatens to proceed to construct its lines of poles and wires on and over the complainants' lands without their leave or license, and without paying or tendering to them compensation for the use of their lands for this purpose, is of itself enough. The Court could not properly refuse an injunction in the face of such an averment. The nature of the damage complained of, whether irreparable or not, has nothing to do with the question when thus presented. *Western Maryland Railroad Company, et al. vs. Owings, et al.,* 15 *Md.,* 199. We shall therefore affirm the orders appealed from in these *eight* cases without considering the question whether the appeals, or any of them, should be dismissed because of the fact that the answers of the defendant are not under its corporate seal.

In the other two cases (those of Smith and McIntosh) the appeals are from *pro forma* orders refusing to dissolve the injunctions upon bills, answers and proof. In these cases the defendant corporation, in its answers, avers that it is proceeding to construct its line of poles and wires along and on the *right of way* of the Maryland Central Railway Company, under a contract with that company made on the 29th of April, 1889, for the use and benefit of the railway company in operating and

running its cars; that the railway company has the right to place telegraph poles and wires, and telephone wires and poles, over and upon its right of way, for the use and operation of its railroad, and as many as may be necessary for operating its road, and for the safety of the public who travel over the same, for the purpose of facilitating the business of the road, and increasing its passenger travel and freight tonnage; and that the railway company could do this themselves or employ some other company to do it for them, and the complainants have therefore no right to interfere.

These answers disclose what is obviously the real controversy in all these cases. On the one side the landowners from whom the railroad company obtained the *right of way* for the construction of its railroad, insist that the construction of this telegraph and telephone line, will impose an *additional servitude or burden* on their lands for which they are entitled to compensation, and that the line cannot be constructed until the corporation or corporations undertaking its construction have first complied with the requirement of the Constitution in regard to taking private property for public use. On the other hand the Telephone and Telegraph Company contend that they are constructing this line upon the right of way of the railroad company, under a contract with that company for its use, and to facilitate the operation of its road, and to increase its business, and in this contention they are aided by the railroad company. The right to construct this line has also been placed in argument upon other grounds, which will be noticed hereafter.

Before considering the facts, we must ascertain the law applicable to such cases, and this is not altogether free from difficulty. Not many instances have occurred in which land-owners have asserted such claims, and the cases in which the precise question before us has been

raised are comparatively few. In the most recent Text-book on *Eminent Domain* it is said "a line of telegraph on a railroad right of way is an *additional burden*, unless constructed for the use of the railroad company in the operation of its road and dispatch of its business." *Lewis on Eminent Domain, sec.* 141. In *Mills on Eminent Domain, sec.* 59, the author approvingly quotes part of the opinion of the Court in *Western Union Telegraph Co. vs. Rich,* 19 *Kansas,* 517. That case, also referred to by *Lewis,* has been strongly pressed upon our attention, and therefore requires a careful examination. It was a suit by a land-owner against the Western Union Tele-graph Company to recover damages for cutting down trees on his land. The trees were on or close to the right of way of the A. T. & S. F. railroad, and were cut down to make room for the telegraph poles, and to prevent interference with the telegraph wires. The de-fendant sought to prove that the telegraph line was built jointly by it and the railroad company, under an arrangement for its joint use by the two companies, and introduced a witness to prove that the line of telegraph was built jointly by the two companies for the use of the railroad company in the moving of its trains and the transaction of its business; that it was part of *and necessary to its business,* and was built on and over the right of way of the railroad company. The lower Court rejected this testimony, and this ruling was held to be erroneous. This was the sole question decided, and in deciding it the Court said: "A telegraph line, if not indispensable to a railroad, tends so much to facilitate its business, and to the speedy and safe running of its trains, that the railroad company has a right to build it, to use its right of way therefor, and to remove all obstructions thereon, to its fullest and most uninter-rupted and beneficial use. Although it may have but an easement in the land, and that easement limited to

its use for railroad purposes, yet a telegraph is so convenient if not indispensable, that it may cut down every tree and bush on the right of way, if necessary for the most constant and efficient use of a telegraph line built by it over and upon such right of way, just as it may dig away a hill, or fill up a ravine for the sake of a water-tank or a station-house. By so doing it gives the adjacent land-owner no claim for damages. Such use is contemplated in the original condemnation, and the damages resulting therefrom are part of the damages included in the assessment therefor. In short, the railroad company may use its right of way not merely for its track, but for any other building or erection which reasonably tends to facilitate its business of transporting freight and passengers, and by such use in no manner transcends the purposes and extent of the easement, or exposes itself to any claim for additional damage to the original land-owner. So that if the railroad company had built this line by itself and independent of the defendant, and in doing so had only cut down trees upon its right of way, it is clear that the plaintiff would have no cause of action therefor. Does the fact that it took a partner in the construction and use of the telegraph expose it, or such partner, to any liability to the land-owner for the full value of trees cut down upon its right of way? We think not. If the railroad company could build by itself without liability, it did not assume liability by building with another. Whatever it could do, and *would have done, for its own use and benefit,* and *was so done,* was, so far as the land-owner is concerned, *damnum absque injuria,* no matter who bore the expense; or, perhaps more correctly, it was damages already paid for. We do not question that every *additional burden* cast upon the land outside the *purpose and scope of the original easement,* no matter in whose behalf, gives the land-owner *new claim* for compensation. But such compensa-

tion is limited to the extent of the additional burden. Of course, if the trees were not upon the right of way, it is immaterial whether the defendant built the line alone or jointly with the railroad company, for in the latter case either would be responsible for the entire damages. We cannot of course pass upon this question of fact, for we cannot tell what the testimony, if admitted, would have disclosed. It is enough that the testimony offered ought to have been admitted, and then the jury instructed that, if the facts were as defendant sought to prove them to be, the defendant was liable for only the damages caused by the *additional burden, if any, its use of the telegraph cast upon the land.*"

We have thus quoted this opinion at length, because it is a very clear statement of the law, which we are willing to accept. It recognizes the right of the landowner to compensation for every additional burden cast upon the land outside the scope of the original easement, and that whether a given structure creates an additional servitude is a *question of fact*, depending on the circumstances of each case, to be determined by the tribunal having jurisdiction to try the same, and before which it is tried. We cannot adopt the view taken by counsel for the appellant that this question must in all cases be determined by the judgment and opinions of the railroad officials or employés. In a case where the question was whether a certain building was a "necessary building," within the terms of a railroad charter, that question was determined by this Court itself, upon proof as to the character of the building, its location, and the purposes for which it was constructed and used. *Hamilton vs. Annapolis & Elk Ridge R. R. Co.*, 1 *Md.*, 560. We entertain no doubt whatever as to the right of a railroad company to construct on and over its right of way a telegraph or telephone line, for its use in the operation of its road and dispatch of its business; and it may do

this by itself, or may employ another company to do it, or may do it conjointly with another company. If, then, this line is in process of construction, or is about to be constructed, over the right of way of this railway company, in good faith, for the use and benefit of the latter in the operation of its road, and to facilitate its business or is reasonably necessary for that purpose, the land-owners have no ground of complaint, because such use of their land is within the scope of the original easement, for which they have already received compensation. But, on the other hand, if this is not the motive for its construction, and the main object in constructing it is to establish an extensive line of telegraph and telephone communication through this and other States, for general commercial purposes, for the use and benefit of the defendant, and such a line is not reasonably necessary for the purposes of the railroad, then it will be a new easement, and put a new and additional burden upon the land for which the owners are entitled to compensation. This question will be decided when we come to consider the facts; but we must first notice the other grounds upon which the right to construct this line is sought to be placed.

By an Act of Congress, approved July 24th, 1866, (U. S. Rev. Stat., sec. 5263,) it is provided, among other things, that "any telegraph company now organized, or which may hereafter be organized, under the laws of any State in the Union, shall have the right to construct, maintain and operate lines of telegraph over and along any of the military or *post-roads* of the United States which have been, or may hereafter be, declared such by Act of Congress;" *provided* such lines "shall not be so constructed as to interfere with the ordinary travel" on such roads. And *provided* also "that before any telegraph company shall exercise any of the powers or privileges conferred by this Act, such company shall file

their written acceptance, with the Postmaster-General, of the restrictions and obligations required by this Act." Congress afterwards, in 1872, declared all the railroads in the country which are now or may hereafter be in operation to be *"post-roads."* There is nothing in these records to show that the defendant has filed its acceptance of the Act of 1866, but as this can readily be done, it is proper we should give our views of the construction and effect of these statutes. We cannot suppose it was the intention of Congress, by these enactments, (even if it had the power to do so,) to put the right of way of every railroad in the country at the mercy of the telegraph companies, and allow the latter to use them, for the construction of their lines, without making compensation to any one therefor. Such a construction was wholly repudiated by Judge DRUMMOND in the case of *Atl. & Pacif. Telegraph Co. vs. Chic., Rock Isl. & Pacif. Railroad Co.*, 6 *Bissell*, 158, and by Judge HARLAN in *Western Union Telegraph Co. vs. Am. Union Telegraph Co.*, 9 *Bissell*, 72. In the latter case, it is expressly said that under this Act the telegraph companies must obtain the consent of the owners of the right of way, or condemn the same *for telegraph purposes*, and make compensation therefor. We have not been able to discover that the views of these Judges on this point have ever been overruled by the Supreme Court in any of its numerous decisions on this statute. On the contrary, in *Pensacola Telegraph Co. vs. Western Union Telegraph Co.*, 96 *U. S.*, 1, that Court said: "This Act gives no foreign corporation the right to enter upon private property, without the consent of the owner, and erect the necessary structures for its business; but it does provide that whenever the consent of the owner is obtained, no State legislation shall prevent the occupation of post-roads for telegraph purposes by such corporations as are willing to avail themselves of its privi-

leges;" and again, "no question arises as to the authority of Congress to provide for the appropriation of private property to the uses of the telegraph companies, for no such attempt has been made. The use of public property alone is granted. If private property is required, it must, so far as the present legislation is concerned, be obtained by private arrangement with its owner. No compulsory proceedings are authorized. State sovereignty, under the Constitution, is not interfered with. Only national privileges are granted." In all the cases in the Supreme Court where telegraph companies have constructed their lines on the rights of way of railroad companies in the States, they appear to have done so by consent, or under agreements with such companies, and in none of them has the question as to the right of the land-owner to compensation for the additional burden thereby cast upon his land arisen. We have always understood that the right of way of a railroad chartered by and running through a State, is the private property of the railroad corporation, and that the land through which it runs, subject to the easement for the railroad, is the private property of the respective land-owners; and we cannot understand how Congress, by declaring such road to be a "post-road," can deprive either the railroad corporation or the land-owners of these property rights, or how it can confiscate them for the benefit of telegraph companies; nor do we think it was the intention of Congress by these enactments to do any such thing. Whatever may be their effect in other respects, we think it clear they are not susceptible of the construction, and have not the effect, sought to be given them by counsel for the appellant. In our judgment, they do not give a telegraph company when it proceeds to construct its lines over a railroad right of way, immunity from the restriction by which the Constitutions of all the States, as well as of the United

OCTOBER TERM, 1889.          547

American Telephone and Telegraph Co. vs. Pearce, et al.

States, have carefully protected the owners of private property when taken by the exercise of the power of eminent domain. In our opinion, therefore, these Acts give no aid to the defendant in regard to the question now before us; and much less does the subsequent Act, approved June 23rd, 1879, which is also relied on. This latter Act is the appropriation bill for the support of the army for the fiscal year ending June 30th, 1880, and in a paragraph making an appropriation for the cost of telegrams and for other purposes, a clause is interjected which declares that "telegrams are authorized to be transmitted by railroad companies which may have telegraph lines, and which shall have filed their written acceptance" of the Act of 1866, "for the government and for the general public, at rates to be fixed by the government." It is obvious this clause has no bearing on the question now under consideration.

Again, it is contended that the defendant is empowered to construct this line, by the statute law of this State, and cannot be restrained from doing so by injunction, but for any damage done to private property thereby, the owners must seek redress by an action at law. For this position, reference is made to the sections of the Code relating to telegraph companies. *Code, Art.* 23, *secs.* 222 *to* 226. All that need be said in regard to these sections is that, if they contain any provision authorizing the construction of telegraph lines on and over private property in the *first instance*, and then requiring the property owners to seek compensation *afterwards* by an action at law for damages, it is in conflict with the constitutional provision referred to, which requires the just compensation agreed upon or awarded by a jury to be *"first* paid or tendered;" that is, *before* the property *is taken.* This provision of the Constitution is, of course, controlling, and that it applies to the case of property taken for the construction of

telegraph lines, there can, we think, be no reasonable doubt; for we regard it as now well settled that use of property for this purpose is a "public use." "A telegraph or telephone line," says *Lewis*, "designed for the service of the public, and subject to regulation by the Legislature, is a *public use* for which property may be taken." *Lewis on Eminent Domain*, sec. 172. The term "public use," says *Mills*, "is flexible, and, cannot be confined to the public use known at the time of the framing of the Constitution. All improvements that may be made, if useful to the public, may be encouraged by the exercise of eminent domain. Any use of any thing which will satisfy a reasonable public demand for facilities for travel, *for transmission of intelligence*, or of commodities, * * * would be a public use." *Mills on Eminent Domain*, sec. 21. The good sense of this proposition commends it to our approval, and we adopt it. Casting an additional burden, for such a purpose, on land already subject to an easement, is just as much taking it for public use, as was the taking of it for the original easement; and, as we have shown, Courts of equity have in this State jurisdiction to prevent by injunction the prosecution of the work until the compensation is paid or tendered. The injunction does not, of course, *prohibit* the construction of the work, but only *suspends* it until this provision of the Constitution has been complied with.

We must now examine the facts disclosed by the records in these *two* cases, for the purpose of deciding the question above stated.

"The Maryland Central Railway Company" is a recent successor to all the property, rights, and franchises of "The Baltimore and Delta Railway Company," a corporation formed under the Act of 1878, ch. 195, by the consolidation of three other companies, the oldest of which was incorporated by the Act of 1868,

ch. 314.   It has also acquired the property and franchises of "The Maryland Central Railroad Company," which was incorporated by the Act of 1867, ch. 121. Its road is a *single track, narrow guage* railroad, running through Baltimore and Harford Counties from Baltimore City to the village of Delta in Pennsylvania, close to the Maryland line,—a distance of *forty-five* miles,—which was not completed and open for traffic throughout its entire length, until the 21st of January, 1884.   Three grants of right of way through complainants' lands were made in 1878 and 1879, and embrace strips of varying width, one being *sixty-six*, one *forty* and the other *thirty* feet.   All the grants express that the land is to be used "for railroad purposes only," and the company could have acquired it for *no other purpose* by condemnation.

At the time the road was completed, it had a line of telegraph poles with *one wire* thereon, which had been constructed by Augustus G. Davis, under a contract with the company, dated the 8th of August, 1883.   By this contract, Davis agreed to "construct and maintain, at his own cost, a *first class* telegraph line" along the right of way from Baltimore to Delta, "the poles to be thirty-five feet in height, and to have thereon," for the exclusive use "of the company, one number nine galvanized wire," and "to furnish one set of telegraph instruments at every railroad station on the line," as the company may direct, and where it may have a station agent or operator and a station house.   The company on its part agreed, among other things, to permit its operators to transact commercial telegraphic business on this line, "until such time as the *business demands* or *necessities*" of the company "may require the *exclusive use* of said wire," at which time Davis agreed "to furnish another, or other wire or wires *for such business.*"   He was also to receive the entire receipts from "commercial business for five years, and to have the right to place on the poles at his

own cost, as many wires for *telephone,* telegraph or other purposes as he may require," provided he did not over-burden the poles "or render them unsafe for the wire or wires" of the company.    It was also agreed that at stations where the company has no operators, and Davis had "an operator or *telephones,*" the company shall have "free use of the same, *or either of the same,* for railroad purposes or business."  · It was also agreed that the wire or wires designated as above for the use of the company, should connect, not only with its North Avenue Station, in Baltimore, but with such city offices as Davis may establish, he to deliver free of charge in the city "all messages relating to railroad business."   The contract was to continue for ten years, with the privilege to the company of continuing it for another ten years, or of discontinuing it, at its election; but if discontinued at any time, the company was bound to purchase the line of poles, wires, and instruments, used for its railroad business, at a valuation to be fixed by arbitrators. Finally, it was agreed that the company should have the privilege, "at its own expense, of placing an addi-tional wire upon said poles for its own exclusive railroad business."    With this line thus built by Davis, and with the *single wire* thereon, the railway company has *managed the running of its trains,* and conducted all the telegraphic communication *necessary for its business,* since its road was completed to the present time.    That line still exists, is *still in operation,* performing all the neces-sary work of the company, and has, with all its appurte-nances and instruments, been assigned and transferred to the railway company by the contract recently made with the defendant.    There was and is no *mechanical* difficulty whatever in· putting on these poles *as many wires* as the company may ever need for its business pur-poses; and its *financial inability* to do so, or to employ telegraph operators at all its stations, has nothing to do with the question we are to decide.

This was the state of things when the defendant company intervened. It took out its Maryland charter on the 19th of March, 1889, and on the 19th of April following made the contract with the railway company. By this the Davis contract is *annulled*, and the railway company grants to the defendant the right, at its own cost, "*to erect, maintain and operate a telegraph and telephone line* upon, over, and along the line of railway of said railway company between the City of Baltimore and the Village of Delta, and along, upon, and over one side solely and only of the right of way." By the other clauses of this contract there is, so far as we can discover, after a careful examination of them, *not a single substantial privilege* granted to the railway company which it did not have under the Davis contract.

Shortly after the execution of this contract the defendant commenced placing on, and erecting along, this right of way, for the purpose of constructing its line, pine and cedar poles brought from Canada, which are long, heavy, and large, varying in diameter from thirteen to nineteen inches. These poles, wherever put up, have arms ten feet in length for the support of wires, and are notched for a number of other similar arms. It is obvious that a structure of this character, and thus equipped, is not being put up in order to subserve or promote the business purposes of *this railroad*, and in no sense of the term can it be regarded as necessary, or reasonably necessary therefor. The bills charge that the corporate body called "The American Telegraph and Telephone Company" is organized for the purpose of establishing lines of communication, at long distances, by telegraph and telephone, and proposes to do business between the City of New York and cities south of it. This charge is not denied by the answers; and that such is the design of those engaged in the prosecution of this enterprize, and that the line over the right of way of

this railroad is to be but a *link* in the chain of such communication, we have no doubt.    This is shown by the character of the structure proposed to be built; by the testimony showing who are the corporators in the Maryland charter, and who own its stock, as well as by the terms of the contract itself made with the railway company; and, still more conclusively, by the fact testified to by one of the witnesses, that the line has left the railroad at Forrest Hill before reaching its Delta terminus, and is being constructed towards another town in Pennsylvania.    We think it clear that no intelligent person can read these records without coming to the same conclusion.    Whether it be true or not, that a railroad can be better managed, as to the running of its trains, by the telephone than the telegraph, the Davis contract provided for the use of telephones, and gave the railway company the *free use* of them whenever they were used by Davis.    Again, assuming that this telegraph and *telephone* line would be a *convenience* to the railway company, and save it *some expense,* still, convenience and saving of expense do not meet the requirements of the law, as we have stated it, on the question before us.

We have thus considered the facts and circumstances of these cases, and find and decide, that the construction of this new and additional line will impose a new servitude on the land of these complainants, and shall therefore affirm the orders appealed from.

Several other questions are presented by the briefs of counsel, and have been, to some extent, argued by counsel; but the views we have expressed render it unnecessary to notice them at length.    It is proper, however, to say that if any of the poles of this line, as erected, infringe upon the lands of the complainants outside of the railroad right of way, or if any of them have been guyed or staid by wires fastened to trees standing on such land, outside of such right of way,

these facts of themselves would entitle the complainants to an injunction.

*Orders affirmed, and*
*causes remanded.*

(Decided 17th December, 1889.)

STONE, J., dissented.